**DE LA RAMA S. S. CO., Inc. v. PIERSON.**

No. 12050.

United States Court of Appeals
Ninth Circuit.

April 1, 1949.

Herman Phleger, Alan B. Aldwell, Bailey Lang, Moses Lasky, and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for appellant.

Robert G. Partridge, of San Francisco, Cal. (Wallace O'Connell, and John P. Whitney, both of San Francisco, Cal., of counsel), for appellee.

Before MATHEWS, STEPHENS, and POPE, Circuit Judges.

POPE, Circuit Judge.

This was an action by H. H. Pierson, a citizen of California, appellee against The De La Rama Steamship Co., a corporation of the Philippine Republic, appellant, to recover damages for breach of an alleged contract to pay Pierson additional compensation for his services as Pacific Coast Manager of the Steamship company.

After trial without a jury Pierson had judgment for $9650. On this appeal the Steamship company contends: (1) that the evidence and findings disclose that it did not promise and made no contract to pay Pierson the amounts sued for, and (2), that had any such promise been made, it would be unenforceable because contrary to the provisions and policy of the Stabilization Act of 1942, 50 U.S.C.A. Appendix, § 961 et seq., and the Regulations thereunder requiring approval of the Salary Stabilization Unit for salary increases.

The action is based upon an alleged oral agreement made in the month of February, 1944. The only persons present at the time were one Suewer, general manager in the United States for the Steamship company, which was engaged in the general maritime shipping business in California and elsewhere, and Pierson, its Pacific Coast manager at its San Francisco office. Pierson testified that he then said to Suewer that the salaries being received by him and other key employees were below those paid by other comparable steamship companies, and that unless they were "taken care of " in some way they might look for work elsewhere.

Although it is conceded that Suewer had authority to act generally for the corporation, whose principal officers were then all in the Philippines and in captured territory, he then disclaimed power to act, but did tell Pierson, as Pierson testified and the court found, "that at the conclusion of the war the said Suewer would recommend to the Board of Directors that such additional sum of money or bonus be paid to plaintiff by defendant, which together with the salary and bonus received by plaintiff during the war would equal the reasonable value of the services performed by plaintiff for defendant during the period of warfare."

The court held that this constituted an enforcible agreement to pay Pierson the reasonable value of his services, not merely thereafter, but from December 7, 1941, to the end of actual combatant warfare on August 14, 1945.

The court found that although the Steamship company, as an employer of more than eight employees, was subject to the salary controls prescribed by the

Stabilization Act of 1942, no approval of Pierson's additional compensation was ever sought or obtained. It found that no such approval was necessary since the additional compensation was payable "only after and upon the termination of wage and salary controls."

It appears that not only was no approval sought for the proposed additional compensation, but none was contemplated. Indeed the proposed arrangement appears to have been suggested in order to avoid having to seek such approval. In 1943 Pierson's salary had been increased from $600 to $708.33 per month after an approval of the Unit which required several months to procure. In relating the substance of Suewer's statement at the time of the alleged agreement, Pierson testified that Suewer's expression was that "he realized at the time it was very difficult to get approvals from the various Government bodies, and he decided that something would have to be done later in the form of taking care of them in some way after the war was over, or when the shooting stopped, anyway, so they could contact the home office." Further indicating that no approval was contemplated is the fact that in 1945, after the claimed agreement was made, a second application for salary increase for Pierson from $708.33 to $750 per month was made to and granted by the Salary Stabilization Unit, without any reference to any promise to make an additional payment after the war.

In 1946, after salary controls had terminated, Suewer recommended to the directors of the corporation that Pierson be paid a special bonus of $2500, which was done. Pierson then brought this action. The amount awarded in the judgment was arrived at by charging the Steamship company with a sum which was the aggregate of $1000 per month from December 7, 1941, to August 14, 1945, and crediting thereon the salary and bonus actually paid Pierson.

The judgment must be reversed for both of the stated reasons specified by appellant.

■ 1. We are of the opinion that there was no contract. The finding of the court and the testimony of Pierson that Suewer promised that at the conclusion of the war he, Suewer, would *recommend* to the board of directors that an additional sum of money be paid to Pierson, falls far short of disclosing any *promise* to pay such sum.

Pierson's theory appears to be that since Suewer unquestionably had authority to make such a promise, his statement that he would recommend to the board of directors that the board pay the additional compensation after the war should be held to be an actual firm undertaking that such compensation would be paid.[1]

By asserting, whether in good faith or otherwise, that he lacked authority, Suewer made it clear that he was not then making any commitment on behalf of his company, but leaving determination of the matter to the board of directors. At the time of the conversation in question, Suewer expressed confidence that the directors would approve his recommendation, but this statement, while designed to persuade Pierson to stay on the job, did not change the import of his words. If these were weasel words,[2] they were so patently designed to evade a definite promise that neither party could have thought that a present contract was intended.

■ 2. We also hold that the defense of illegality is well taken.

We see no answer to the argument made

---

[1] There is no attempt to sustain the judgment on the theory that the Steamship company should be liable because Suewer failed to recommend as large a bonus as he said he would. At most this could be held to be equivalent to an agreement that the board would consider a larger bonus. "It does not require demonstration to show that such an undertaking falls short of contract." Montreal Gas Company v. Vasey, [1900] A.C. 595, 599.

[2] When the case was first submitted to the trial judge he made an "Order for Judgment" which recited: "While I am convinced by the evidence that the plaintiff has been unfairly treated by the defendant through its general manager, there is not in the record any evidence of contractual liability upon the part of the defendant. Consequently it is my duty to render judgment for defendant and such will be the order."

by the appellant that if such a contract as is here claimed could validly be made without procuring the approval required by the Stabilization Act and the regulations relating to salary increases, the Act could effectively be circumvented. The stated purpose of the Act was to authorize a general order "stabilizing prices, wages, and salaries, affecting the cost of living." 50 U.S.C.A. Appendix, § 961. The Executive Order, No. 9250, 50 U.S.C.A. Appendix, § 901 note, set forth "the purpose of * * * minimizing the unnecessary migration of labor from one business, industry, or region to another." If the Steamship company could by this agreement bind itself, any employer could as easily avoid regulations designed to "hold the line" on salary levels by simply issuing to its employees notes payable after controls should be lifted.

Appellee points to the language of the Act, section 5(a), 50 U.S.C.A. Appendix, § 965(a), which recites: "No employer shall pay, and no employee shall receive, wages or salaries in contravention of the regulations promulgated by the President under this Act." He urges that this language merely prevents the *paying* or *receiving* of increased compensation without the prior approval of proper authorities. The argument is that since the law forbids *payment* without prior approval, it cannot be construed to forbid or prohibit *promises of payment* in the absence of an express provision to that effect.

As for the contention that the letter of the quoted language of the Act merely prohibits payment, and does not prohibit promises of payment, we would not hesitate to hold that in view of the declared purposes of the Stabilization Act, such an attempt, without approval of the Stabilization Unit, to provide additional inducements to employees by way of promises of future payments, was prohibited by the Act. We have in mind the rule of statutory construction stated in Van Beeck v. Sabine Towing Co., 300 U.S. 342, 350, 57 S.Ct. 452, 81 L.Ed. 685. Section 1667 of the Civil Code of California, where the facts of this case arose, declares unlawful not only that which is "contrary to an express provision of law", but as well what

is "contrary to the policy of express law, though not expressly prohibited".

An examination of the regulations promulgated under the Stabilization Act furnishes a more explicit answer to the question here considered.

The regulations of the Economic Stabilization Director, 8 F.R. 4681, 11960; 32 C.F.R. 1943 Supp.Sec. 4001.1(e), provided: "The term 'salary' or 'salary payments' means *all forms of direct or indirect compensation* which is computed on a weekly, monthly, annual or other comparable basis, except a wage basis, for personal services of an employee irrespective of when rendered, including bonuses, additional compensation, gifts, loans, commissions, fees *and any other remuneration in any form or medium whatsoever* (excluding insurance and pension benefits in a reasonable amount)." (Emphasis ours)

By section 4001.4 of the same regulations authority to approve increases in *salary rate* was conferred upon the Commissioner of Internal Revenue. Section 4001.5 granted the Commissioner power to prescribe further regulations with the approval of the Secretary of the Treasury. Pursuant to this authority and on September 4, 1943, with the consent of the Secretary of the Treasury (T.D. 5294; 8 F.R. 12428), the Commissioner issued revised regulations which were in effect at the time of the alleged agreement (T.D. 5295, 8 F.R. 12429, 29 C.F.R. 1943 Supp.Secs. 1002.1–1002.35).

Section 1002.6 in defining the terms "salary" and "salary payment" provided: "These terms are not used in any restricted, narrow or technical sense, but encompass all forms of direct or indirect compensation for personal services of an employee which is computed on a weekly, monthly, annual or other basis, other than wages. * * * Bonuses, gifts, loans, commissions, fees, additional compensation and any other remuneration in any form or medium whatsoever are considered as falling within the concept of 'salary' or 'salary payment'." 8 F.R. 12430.

The same section provided: "All amounts paid to, authorized to be paid to, or *accrued to the account* of any employee

during a calendar year for services rendered or to be rendered are to be included as salary for such year." (Emphasis ours)

Section 1002.14, after authorizing payment of a bonus which does not exceed a bonus paid in previous years, provided: "Any other bonus or other form of additional compensation requires approval by the Commissioner." 8 F.R. 12,432.

Section 11 of the Stabilization Act, 50 U. S.C.A. Appendix, § 971, provided penalties for violation of these regulations. A firm promise to pay additional compensation for services, no matter when payment is to be made, would constitute "additional compensation", and would have "accrued to the account" of the employee, within the meaning of these regulations.

Administrative rulings made by the Commissioner in rejecting applications for approval of similar arrangements show that he treated them as falling within the provisions of the Act.[3]

The conclusion is irresistible that if an agreement were made as found by the lower court, it was not merely an agreement to require the doing of an unlawful act,—the very making of the agreement was itself in violation of the Regulations referred to.

Our attention has been called to Nussenbaum v. Chambers & Chambers, Inc., 322 Mass 419, 77 N.E.2d 780. There an agreement with defendant's manager made in the spring of 1945, before salary controls were lifted, and providing for payment to him at the end of the year of compensation in addition to his approved salary, was upheld against a claim of illegality, although the agreement for the extra compensation was never approved by the Stabilization Unit.

That case differs from this in that there the court assumed that the parties contemplated seeking such approval before payment. The court did, however, say of the Stabilization Act: "The prohibitions of the act were specifically directed against paying or receiving wages or salaries and not against the making of executory agreements.". In reaching this conclusion it put much emphasis upon section 4001.10 of the Regulations of the Economic Stabilization Director declaring certain unapproved salary rate increases in contravention of the Act *"from the date of the payment."*

Evidently the attention of the Massachusetts court was not called to the Regulations of the Commissioner of Internal Revenue, to which we have alluded (29 C.F.R. 1943 Supp. Secs. 1002.1 to 1002.35), or it would have noted that the Commissioner, in his later regulation, Sec. 1002.13, omitted the language upon which that court relied, and provided that any unapproved salary increase "is *from the date of such increase* in contravention of the Act." (Emphasis ours)

For the reasons here given we cannot agree with the views of the Massachusetts court. Our own opinion is in accord with the decision of the Court of Appeals of the Seventh Circuit in In re Pringle Engineering & Mfg. Co., 164 F.2d 299.

The judgment is reversed.

---

[3] Letter Ruling Dec. 11, 1944, Vol. 1A, CCH Labor Law Service (3d Ed.) Par. 15,162, disapproved a plan for the accumulation of a reserve fund to be invested and held by the employer for distribution to the employee after restrictions were removed. To the same effect, see Mimeograph No. 5604, Dec. 6, 1943 amended by Supplement 1 on Feb. 23, 1944, as amended Feb. 8, 1945, Vol. 1A CCH Labor Law Service (3d Ed.) P. 14,-593–2, Par. 15,082.

For a similar ruling with respect to rent control, see Interpretation Maximum Rent, XI, Sept. 26, 1942 (CCH War Law Service #49,127.12, Par 3).

For a decision relating to a similar question arising under price regulations see Bowles v. Bayuk Cigars, D.C., 59 F. Supp. 745.