OPINION. Tuenee, Judge: The respondent has determined that in 1945 the petitioner realized taxable income in the amounts of $1,563.87 and $32,521.32 from contracts for burial rights or space in the Fourth Unit of the petitioner’s mausoleum entered into in 1944 and 1945, respectively. The deficiency notice does not disclose how such amounts were determined but indicates that such information had been furnished to the petitioner in a prior communication. Neither party has made such communication or its contents a part of the record in this proceeding. However, from statements of counsel and arguments made on brief it appears that the respondent has treated the contracts as completed sales of property in 1945 and has treated the amounts made available to, or received by, the petitioner in that year from the contracts as installment payments for the property. The petitioner contends that at the end of 1945 the contracts were purely executory, that the amounts received thereunder were mere contingent payments made pursuant to conditional agreements to sell burial space which then was nonexistent and that accordingly the contracts are in no wise to be regarded as closed or completed sales. The petitioner further contends that it is the gain from the sale of property that constitutes gross income; that since the Fourth Unit had not been completed at the end of 1945 and its final cost was not then known or determinable with reasonable accuracy the basis for computing gain or loss was likewise unknown and undeterminable at that time; and that the respondent erred in determining that taxable income was realized in 1945 from the contracts. The respondent takes the position that the primary question here is one of accounting and that the question of whether the contracts were executory or completed is immaterial and irrelevant. He contends that since the petitioner has not established that it is entitled to use some other method of accounting than that employed by respondent in making his determination and has not shown that the items of gross income realized by it in 1945 from installment sales of space made in 1944 and 1945 should be accounted for in some year other than 1945, the determination should be sustained. Since the respondent’s determination appears to have been grounded on the determination that the contracts in controversy represented completed sales of property and since there is no controversy between the parties as to whether the property involved was realty or personalty we are not called on here, as we were in Community Mausoleum Co., 33 B. T. A. 19, to determine whether the property was of one type or the other. Consequently, we make no determination on that point. While in 1944 the petitioner began entering into contracts with respect to space in the Fourth Unit, which it planned to construct, the petitioner was not required under the contracts to construct the unit, or once construction was begun it was not required to complete it. In either event a return of the amounts paid by the purchasers plus interest would relieve petitioner of any liability under the contracts. Although the contracts provided that the material, workmanship, unit construction and crypt size in the Fourth Unit would be along the lines and kinds as prior units of the mausoleum the petitioner was free for any reason satisfactory to itself to depart therefrom. In such event the purchaser could refuse to take space in the unit and was entitled to a refund of any payments made. Petitioner’s liability ended with refunding the payments. Under the non-escrow contracts a purchaser could, upon completion of the Fourth Unit, refuse to take the space contracted for therein and elect to take space of an equal or greater value in some other portion of the petitioner’s mausoleum and receive full credit for all payments made for the contracted space. Under neither type of contract was the petitioner required to convey title to the space contracted for by the purchaser until completion of construction of the unit. A sales agreement from which either the seller or the buyer may withdraw is not a completed sale. United States Industrial Alcohol Co. v. Helvering, 137 F. 2d 511. In view of the foregoing it is difficult to see how the contracts could be considered as completed sales in 1945, particularly since at the end of that year construction of the Fourth Unit had proceeded no further than putting in the foundation and the concrete floor slab and since a number of contracts for the construction of other portions of the unit had not been let. In our opinion the contracts for burial space that were entered into in 1944 and 1945 were executory and contingent contracts to sell and not completed sales. From the situation existing at the end of 1945, as appears in our findings, we have concluded and so found as a fact that as of the close of that year the petitioner was not able to determine what the cost of constructing the Fourth Unit would be. Since the cost of the unit was not determinable at the end of 1945 and since the contracts were executory and contingent the situation here is similar to that presented in Veenstra & DeHaan Coal Co., 11 T. C. 964. In that case the taxpayer was engaged in selling coal at retail and reported its income on the accrual basis. During 1943 it received deposits from customers on contracts to sell and deliver coal to them at its retail prices in effect at the time of delivery. At the close of 1943 the taxpayer had on hand only a small portion of the amount of coal necessary to make the deliveries required under its contracts. It did not know whether it would be able to obtain the required amount of coal, did not know at what wholesale price it would be able to acquire such coal, if available, and did not know what its retail price for such coal would be at the time of delivery. After pointing out that the gross income arising from the sale of property is the excess of the selling price over the cost or other basis of the vendor; that the vendor has no gain or gross income until a sale is made; that the statute taxes gains from sales and not estimated gains from contracts to sell, and that not until a transaction of sale is a closed one will a gain arise which constitutes gross income to the vendor, we there held that the deposits received during 1943 and on hand at the end of the year did not constitute taxable income for that year and that the respondent’s action in including them in gross income for that year was not only erroneous but also arbitrary within the rule of Helvering v. Taylor, 293 U. S. 507. Unlike in the Veenstra case, the respondent here is not attempting to tax the full amount of the payments made in 1944 and 1945 but only the portion of them which he apparently considers to be the gain. However, to sustain such an attempt would require treating the contracts as closed sales in 1945 and either arbitrarily estimating the petitioner’s cost or other basis with respect to each or resorting to the use of actual costs which were ascertainable only in some year subsequent to 1945. Since such action would be in violation of the principles set forth in the Veenstra case, it cannot be sustained. Accordingly, we hold for the petitioner on this issue. The remaining issue is whether the petitioner, who reports its income on an accrual basis, was entitled to deduct in 1945 an amount of $7,945.70 which it paid in that year to the Wilson brothers and Sharp and which represented the portion of the commissions for 1943 that were not paid in 1943. The petitioner takes the position that the $7,945.70 plus the salaries and commissions actually paid in 1943 constituted reasonable compensation for the services rendered by the Wilson brothers and Sharp in 1943 and that since no liability for the payment of the $7,945.70 was incurred prior to 1945, said amount accrued and became deductible in that year. The respondent contends that the petitioner has failed to establish the reasonableness of the compensation and further that the amount in question accrued or was accruable in 1943 and, therefore, is not properly deductible in 1945. The evidence relating to commissions paid on sales by cemetery companies in the Miami area in 1943 shows a range of from 15 per cent to 35 per cent of sales. The lowest rate was paid by the smallest cemetery in the area to its only active officer who also received a salary and made sales only from the office. The highest rate was paid by another cemetery to its general office manager and sales director who was without previous experience in the cemetery business. Out of the 35 per cent of the sales price received by him he paid about 25 per cent of the sales price to his salesmen and expended about 5 per cent in advertising. From a careful consideration of all the evidence bearing on the question we have concluded and so found as a fact that the salaries and commissions actually paid in 1943 to the Wilson brothers and Sharp, who were experienced in the cemetery business, plus the commissions of $7,945.70 paid to them in 1945 constituted reasonable compensatation for the services rendered by them to the petitioner in 1943. The resolution adopted by petitioner’s board of directors in April 1943 fixing commissions for that year merely recited “that a commission of 25 per cent be paid on all sales made during the year 1943.” It contained no specific provision respecting the time when, or conditions under which, liability was to be incurred or payment was to be made. Ordinarily under such a resolution liability for payment for the full amount of commissions would accrue in 1943 and the amount of such liability would be deductible only in that year. But the situation existing in 1943 was not usual or ordinary. The Emergency Price Control Act of 1942 had been amended on October 2, 1942, by the Stabilization Act of 1942, Public Law 729, Seventy-Seventh Congress, Second Session, Chapter 578. The Stabilization Act authorized and directed the President to issue a general order stabilizing prices, wages, and salaries affecting the cost of living and, except as otherwise indicated therein, provided that such stabilization should so far as practicable be on the basis of the levels which existed on September 15, 1942. The Act provided that no employer should pay, and no employee should receive, wages or salaries in contravention of the regulations promulgated by the President thereunder. The Act also provided for a fine or imprisonment or both for the violation of its provisions or the violation of any regulation promulgated under it. Pursuant to the provisions of the Act, the President, on October 3,1942, promulgated Executive Order No. 9250, 7 F. R. 7871. That order contained among others, the following provisions : Title II — Wage and, Salary Stabilization Policy. 1. No increases in wage rates, granted as a result of voluntary agreement, collective bargaining, conciliation, arbitration, or otherwise, and no decreases in wage rates, shall be authorized unless notice of such increases or decreases shall have been filed with the National War Labor Board, and unless the National War Labor Board has approved such increases or decreases. ******* Title III — Administration of Wage and Salary Policy. ******* 3. No provision with respect to wages contained in any labor agreement between employers and employees * * *, which is inconsistent with the policy herein enunciated or hereafter formulated by the Director [Economic Stabilization Director] shall be enforced except with the approval of the National War Labor Board within the provisions of this Order. * * * 4. In order to effectuate the purposes and provisions of this Order and the Act of October 2, 1942 [Stabilization Act of 1942], any wage or salary payment made in contravention thereof shall be disregarded by the Executive Departments and other governmental agencies in determining the costs or expenses of any employer for the purpose of any law or regulation, including the Emergency Price Control Act of 1942 or any maximum price regulation thereof, or for the purpose of calculating deductions under the Revenue Laws of the United States or for the purpose of determining costs or expenses under any contract made by or on behalf of the Government of the United States. Title VI — General Provisions. ******* 2. Salaries and wages under this Order shall include all forms of direct or indirect remuneration to an employee or officer for work or personal services performed for an employer or corporation, including but not limited to, bonuses, additional compensation, gifts, commissions, fees, and any other remuneration in any form or medium whatsoever (excluding insurance and pension benefits in a reasonable amount as determined by the Director); but for the purpose of determining wages or salaries for any period prior to September 16, 1942, such additional compensation shall be taken into account only in cases where it has been customarily paid by employers to their employees. “Salaries” as used in this Order means remuneration for personal services regularly paid on a weekly, monthly or annual basis. An agreement for increased compensation for services made during the period the Stabilization Act was in force and for which increase .the approval required by that Act and the orders and regulations issued thereunder was not obtained was illegal and unenforceable. De La Rama S. S. Co. v. Pierson, 174 F. 2d 84; In re Pringle Engineering & Manufacturing Co., 164 F. 2d 299; Kells v. Boutross, 53 N. Y. S. 2d 734; Del Re v. Fremkes, 81 N. Y. S. 2d 97; Morford v. Bellanca Aircraft Corporation, 67 A. 2d 542. Even though such an agreement provided that payment of the increase would be made after the lifting of stabilization controls it was nevertheless illegal and was unenforceable after such controls were lifted. De La Rama S. S. Co. v. Pierson, supra; In re Pringle Engineering & Manufacturing Co., supra; Lefkowitz v. Enoz Chemical Co., 92 N. E. 2d 216. Prior to 1942 the petitioner had paid the Wilson brothers and Sharp commissions of 20 per cent on sales. The resolution adopted by the directors in 1943 stated that commissions for that year should be 25 per cent. Such increase in commissions was subject to the provisions of the Stabilization Act and the approval required by that Act was necessary before payment could be made legally during the period the stabilization controls were in force or before an enforceable liability for payment after the lifting of such controls could be incurred. Whatever may have been the intention of the petitioner’s officials respecting an application for approval of the increase at the time the resolution was adopted, such approval, so far as shown, was never sought nor obtained. Nor is there any showing as to why such approval was not sought. Furthermore, the record is silent as to whether the petitioner made any entries on its books recording as an accrual the amount of the increase or any portion of it. Before adopting the resolution the petitioner’s directors had been informed by petitioner’s auditor as to the governmental regulations relating to salary and wage increases. Doubtless in adopting the resolution they were well aware that for it to be effective the required approval would be necessary. Since it is an implied condition of every contract or undertaking that a party will not be required to do anything that is unlawful and since it does not appear that the petitioner ever sought the required approval, it is our opinion that the resolution is not to be regarded as an attempt, in contravention of law, to pay, in 1943, or to incur in that year a liability for subsequent payment of, increased compensation. The factual and legal situations being as they were, the resolution at the most could only indicate an existing intention on the part of the corporation to incur such an obligation when the Stabilization Act would no longer be in force. It is accordingly our conclusion that there was no liability accrued or accruable in 1943 for the added commissions and that the respondent’s contention to the contrary must be denied. By Executive Order No. 9299,10 F. It. 10155, issued August 18,1945, the President lifted stabilization restrictions to the extent that employers might make wage and salary increases without obtaining the approval required by the Stabilization Act on the condition that such increases would not be used in whole or in part as the basis for seeking an increase in price ceilings, or for resisting otherwise justifiable reductions in price ceilings, or, in the case of products or services being furnished under contract with a Federal procurement agency, would not increase the costs to the United States. After the restrictions on wage and salary increases had been lifted by the Executive Order, cited above, the petitioner did incur and pay to Sharp and the Wilson brothers $7,945.70 as commissions on sales made by them in 1943, that amount being 5 per cent of the said sales. We have already stated our conclusion that the salaries and commissions actually paid to them by the petitioner in 1943, plus the added commissions paid in 1945, did constitute reasonable compensation for services rendered by them to the petitioner in 1943. Such being the case, the petitioner’s claim of deduction for the $7,945.70 in question is well taken, and the disallowance thereof by the respondent is denied. Lucas v. Ox Fibre Brush Co., 281 U. S. 115; Atlumor Manufacturing Co., 12 T. C. 949. Because of other items involved in the respondent’s determination of the deficiencies herein, which are not in controversy, recomputation of the deficiencies is required. Decision will be entered v/nder Bule 50.