**MITCHELL**

v.

**TEXAS HOUSING CO. et al.**

No. 14750.

Court of Civil Appeals of Texas.

Dallas.

Jan. 15, 1954.

Rehearing Denied Feb. 12, 1954.

Storey, Armstrong & Steger, and Oster, Kaufman & Lerner, Dallas, for appellant.

Irion, Cain, Bergman & Cocke, Dallas, for appellees.

YOUNG, Justice.

Appellant by petition in trial court against Texas Housing Company and New Mexico Housing Company sought a recovery of damages for breach of an oral contract of employment allegedly entered into between Mitchell and Winfield Morten, President of the Texas concern. The New Mexico defendant was made a party on information and belief that there was either a merger of the two companies or that the latter had taken over the assets of the Texas Housing Company. Unless otherwise stated, the mention of defendant herein is with reference to the latter company. Upon trial to a jury on special issues with answers as hereinafter shown, the court, on amended motion presented by plaintiff, rendered a judgment in his favor for $10,066.-

67; and being dissatisfied therewith he has duly prosecuted this appeal.

Ground of the court's judgment was the jury finding that plaintiff's employment began on January 15, 1951, continuing to Nov. 17, 1951 at a salary of $1,000 per month; the latter figure in turn being based on a ruling of the Federal Salary Stabilization Board of Sept. 24, 1952, in substance, that Mitchell's compensation should be fixed on basis of a salary of $12,000 per year from inception of the employment; which ruling was pursuant to information furnished by attorneys for appellees. The parties differed in toto concerning the oral contract actually entered into and the remuneration therefor; plaintiff claiming in effect that his compensation was to be 3% of all gross sales, praying for a total of $205,200 with additional attorney's fees; and alternatively, upon quantum meruit for the same amounts. Defendants after special exceptions and general denial alleged another and entirely different contract of employment between the parties, entered into Feb. 9, 1951, terminable at any time by either party and having to do with the promotion of commercial sales of defendants' product; that the agreement was wholly subject to Defense Production Act of 1950, § 405(b), 50 U.S.C.A.Appendix, § 2105, effective Jan. 26, 1951, and regulations of Office of Salary Stabilization made pursuant thereto; that the employment agreement pled by plaintiff, if made, was in violation thereof and void; said opposing contentions being reflected in jury issues and answers, in substance, that (1) Mitchell's employment contract with Texas Housing Company began January 15, 1951; (2) that the compensation Mitchell was to receive from the named defendant through Winfield Morten, its President, was not agreed upon prior to January 25, 1951; (3) that the compensation to be received by Mitchell as an employee of defendant Housing Company was in fact agreed upon on or about February 9, 1951; (Issue 4 presented plaintiff's version, issue 5 that of defendants relative to terms of the contract actually entered into by the parties on or about February 9, 1951; the jury answering "No" to each of said

issues.[1]); (6) reasonable value of the services rendered by Mitchell to defendant Housing Company "during the period of this employment" was $34,000; Issues 7 and 8 were conditional upon affirmative answers to above issues 4 and 5 and properly disregarded by the jury.

Points of appeal assert errors of the trial court, (1) "in limiting the amount which could be paid to appellant to the amount specified in the rulings of the Salary Stabilization Board rather than the amount as found by the jury for the reason that the recovery was on a quantum meruit basis which said quantum meruit began on January 15, 1951, there being no basis under which the Salary Stabilization Act or rulings of the Salary Stabilization Board could be held to apply to appellant under these circumstances"; (2) "in holding that appellant's compensation was controlled in any way by the Salary Stabilization Act or the rulings of the Salary Stabilization Board because this defense raised by appellees is in the nature of a plea of illegality and the appellees failed to discharge their burden of proving the illegality"; (3) "in rendering judgment limiting appellant's recovery to the amount as approved by the Salary Stabilization Board for the reason that at the time of the entry of judgment, the salary stabilization controls had been suspended and the rulings of the Economic Stabilization Director clearly showed that a 'Decision' could now be made making adjustments retroactive to a time when the salary stabilization rulings were in effect. (Point 4 was withdrawn by appellant following submission of cause.) (5) "* * * in refusing to give appellant a judgment for the amount as found by the jury in that even though the salary stabilization regulations apply to this cause, which appellant still does not admit, but denies, then the only thing which was prohibited under the Salary Stabilization Act was payment and at the time of the judgment, the law having been suspended and of no further effect, there was no reason why appellees should not be ordered to pay appellant the amount as found by the jury"; (6) "in limiting the amount of the judgment in favor of appellant because of the ex parte submission of the request for a ruling from the Salary Stabilization Board, should said Board have any authority whatever in this situation, which appellant expressly denies, and because of the consideration by the Salary Stabilization Board of only the facts as alleged by appellees herein and that as to this appellant in the event the salary stabilization regulations apply to him they are a vio-

---

1. These issues were: (No. 4) "Do you find from a preponderance of the evidence that it was understood and agreed by and between Bert J. Mitchell and Winfield Morten that Bert J. Mitchell was employed as Executive Director of Distribution of the Texas Housing Company, and that Bert J. Mitchell's compensation was 3 per cent of all the gross sales of said Texas Housing Company, Bert J. Mitchell agreeing to pay his own traveling and advertising expenses and Texas Housing Company furnishing plaintiff an office, secretarial help and use of all facilities and cooperation from all officials of Texas Housing Company?" (No. 5) "Do you find from a preponderance of the evidence that it was understood and agreed between Bert J. Mitchell and Winfield Morten that Bert J. Mitchell would be employed by Texas Housing Company for the purpose of developing a commercial sales department and to promote commercial sales, and in this connection agreeing to the establishment of a fund to be used to create such commercial department by applying the formula appearing plaintiff's Exhibit 2 to all gross sales of the company to an amount not to exceed $70,000.00, and that after said commercial sales department had been established all commercial business, as distinguished from Government Business, would be handled through said department by Bert J. Mitchell with an additional 10 per cent being added to the price of the products manufactured by Texas Housing Company as sold to the United States Government or any of its agencies, which additional 10 per cent on commercial sales would be set aside in a fund of which Bert J. Mitchell would receive 30 per cent, equivalent to 3 per cent on the gross commercial sales, with the remaining 70 per cent equivalent to 7 percent on the gross commercial sales being used to pay the expenses of the operation of the said commercial department?"

lation of the due process of law as to this appellant under the Fifth Amendment of the Constitution of the United States' of America"; (7) "in holding that it was bound by the rulings of the Salary Stabilization Board because it is clear that appellees did not act in good faith in the filing of their various applications with the Salary Stabilization Board." Appellees answered by appropriate counter-points, urging applicability and validity of the Salary Stabilization Board regulations and rulings; and illegality of any wage agreements made in violation thereof; with further cross points: (1) That "If the rulings of the Salary Stabilization Board of April 24, 1952, and September 24, 1952, are not valid and applicable to the salary that could be paid appellant, then the contract, express or implied, under which appellant was employed, was illegal, void and unenforceable and appellant can recover nothing in this cause"; and (2), insufficiency of evidence to support the jury finding on quantum meruit of $34,000.

The Defense Production Act of 1950 in purpose was for stabilization of prices, wages and salaries incident to the successful prosecution of a war and prevention of great monetary inflation invariably connected therewith. Section 405(b), of the Act, 50 U.S.C.A.Appendix, § 2105, provides: "(b) No employer shall pay, and no employee shall receive, any wage, salary, or other compensation in contravention of any regulation or order promulgated by the President under this title. * * * The President shall also prescribe the extent to which any wage, salary, or compensation payment made in contravention of any such regulation or order shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any employer for the purposes of any other law or regulation." Pursuant thereto the Director of Economic Stabilization on January 26, 1951 made an order freezing all wages in the United States as of that date; the Economic Stabilization Administration further issuing General Salary Regulation No. 1, sections of which (C.C.H. Emergency Labor Law Reports— Wage and Manpower Controls, par. 45,

181) read: "(a) The word 'Employee' shall mean persons employed in bona fide executive, administrative, professional or outside salesmen capacities * * *." "Sec. 1(b): The words 'salaries and other compensation' shall include all forms of remuneration to employees by their employer for personal services, including, but not limited to, vacation and holiday payments, night shifts and other bonuses (incentive payments, year-end bonuses, employer contributions to or payments of insurance or welfare benefits, employer contributions to a pension fund or annuity, payments in kind, and premium overtime practices and rates)." "Section 3(a): Except as authorized by this regulation, no employer shall pay any employee, and no employee shall shall receive 'salaries and other compensation' at a rate in excess of the rate at which such employee was compensated on January 25, 1951, without the prior approval or authorization of the Office of Salary Stabilization. New employees shall not be compensated at rates higher than those in effect on January 25, 1951, for the job for which they are hired. (b) Nothing in this regulation shall be construed to require the stabilization of salaries and other compensation for any job at a rate less than that paid during the period from May 24, 1950, to June 24, 1950, inclusive. (c) Petitions for the approval of any increase in salary and other compensation not otherwise permitted by this regulation shall be filed with the Office of Salary Stabilization." "7(d) New or changed jobs.—Rates for new or changed jobs may be established in accordance with plans or procedures in effect on January 25, 1951, or, if no plan or procedure was in effect on such date, the rate established must be in balance with the existing rate structure. Slight or inconsequential changes in job content shall not provide the basis for establishing new job classification, rates or rate ranges, nor justify changes in existing job classifications, rates or rate ranges." Section 7(e)(iii): "(e) Hiring of new employees.—A new employee may not be hired at a rate exceeding: * * * (iii) The minimum rate paid to any employee doing similar work during the pay period immediately preceding January 25, 1951, if the establishment

has no system of job classification"; section 409(b) of the general Act providing criminal penalties for violation thereof, viz: "Any person who willfully violates any provision of section 405 of this title shall be guilty of a misdemeanor and shall, upon conviction thereof, be subject to a fine of not more than $10,000, or to imprisonment for not more than one year, or both. * * *"

From above quoted provisions of this Defense Act and regulations thereunder it will be observed, first, that salaries of employees under section 1(b) (obviously inclusive of payments on basis of quantum meruit) were not to be increased after January 25, 1951 without authorization of Office of Salary Stabilization; and that under section 3(a), with reference to a new employee (appellant concededly occupying this status), he was not to be compensated at a rate higher than those in effect on January 25, 1951 for a job of similar nature, without Federal approval. In keeping with these regulations, appellees secured a ruling from the Office of Salary Stabilization of date Sept. 24, 1952, fixing appellant's salary at rate of $12,000 per year. Secondly, it will be further noted that issues 4 and 5 above, answered in the negative by the jury, carried their own formula of compensation; and issue 3 established that on Feb. 9, 1951 compensation for Mitchell's employment had been agreed upon, the jury not being asked to determine what that agreement was in amount or terms. We find no conflict in the findings made; plaintiff arguing therefrom (Point 1) that prior to effective date of Federal Defense Production Act and beginning on January 15, 1951 (date of employment) there was already a contract implied by law that he would be paid the reasonable value of his services; such value being fixed by the jury at $34,-000, and thereby a valid and subsisting obligation.

The argument appears to attach no significance to jury finding No. 3 that the agreement for compensation was entered into Feb. 9, which date appellant in his pleading rather inconsistently fixes as the commencement of his employment.[2] Be this as it may, we conclude that the controlling question presented by the jury verdict as a whole is this: Did the finding that appellant's employment began on January 15, 1951, render inapplicable the provisions of the Defense Production Act of 1950 to the service contract under discussion, where the jury has also found that no agreement relative to his compensation was made prior to January 25, 1951, the beginning date of Federal controls? We do not think so, but that on the other hand to remove applicability of the quoted war measure, appellant's contract of employment must have anticipated the advent of controls in all essentials, such as compensation to be paid; the Act prohibiting not only payments of compensation unless in conformity thereto, but *agreements* for compensation. Although made in good faith, we see no difference in principle between an agreement for compensation made during Federal control but relating to employment commencing prior thereto, and one similarly made but payable after suspension of controls; for in either case the control Act would be rendered easy of circumvention. Claims of the class last mentioned (for increased compensation, bonuses, etc.), payable upon termination of controls under comparable Federal Acts, have been uniformly condemned. In Woodlawn Park Cemetery Co. v. Commissioner of Internal Revenue, 16 T.C. 1067, C.C.A.Dec. 18, 281, the 1943 bonus paid in 1945 was held valid on basis of a *new agreement* made between the parties *after* the lifting of controls. Relevant here, the court held: "An agreement for increased compensation for services made during the period the Stabilization Act was in force and for which increase the

2. He pled that "On or about January 15, 1951, Defendant, Texas Housing Company, acting through its President, Winfield Morten, requested plaintiff to consider employment with said Texas Housing Company, defendant, *and after negotiations culminated in a partially written and partially oral contract, on or about February 9, 1951, wherein it was agreed between plaintiff and defendant, Texas Housing Company, that plaintiff was employed as executive director of distribution of said Texas Housing Company."* (Emphasis ours.)

approval required by the Act and the orders and regulations issued thereunder was not obtained was illegal and unenforceable. De La Rama S. S. Co., Inc. v. Pierson, 9 Cir., 174 F.2d 84; In re Pringle Engineering & Mfg. Co., 7 Cir., 164 F.2d 299; Kells v. Boutross, Sup., 53 N.Y.S.2d 734; * * * Morford v. Bellanca Aircraft Corp., Del.Super., 67 A. 2d 542. Even though such an agreement provided that payment of the increase would be made after the lifting of stabilization controls it was nevertheless illegal and unenforceable after such controls were lifted. De La Rama S. S. Co., Inc. v. Pierson, supra; In re Pringle Engineering & Mfg. Co., supra; * * *."

The case of Thacker v. American Foundry Co., 78 Cal.App.2d 76, 177 P.2d 322, cited by appellant, is readily distinguishable. There the employer had refused to submit to the Commissioner of Internal Revenue for approval Thacker's claimed salary; the court holding that the employer was not in position to urge such defense, absent proof that the salary contended for was in excess of the minimum prevailing in the Foundry's own organization, or within the particular area. Here the matter of Mitchell's salary rate was submitted to the Office of Wage Stabilization along with a showing of salaries paid to employees holding similar positions; the salary of a Mr. King of between $6,000 and $7,000 per year being more nearly comparable to the duties allegedly performed by plaintiff, and a ruling made fixing his salary rate at some $1,000 per month. As pointed out by appellees, as part and parcel of any agreement for compensation made during period of controls (in this instance, on Feb. 9, 1951) was the Defense Production Act of 1950 whereby all claims for compensation not permitted by its regulations, whether in quantum meruit or otherwise, would be manifestly without legal basis and unenforceable.

Our discussion thus far demonstrates, we believe, that appellees' defense of illegality concerning Mitchell's claim for compensation on basis of quantum meruit has been sufficiently pled and established, notwithstanding the employment began pri-

or to date of controls. Point 2 is therefore overruled, calling attention to Morford v. Bellanca Aircraft Corp., Del.Super., 67 A. 2d 542, 546, announcing the rule applicable here. The cited case is likewise controlling of appellant's point 6 arguing unconstitutionality of any salary control regulation permitting only the employer to file application with the Stabilization Board in fixing of compensation for a new employee.

Factually, in the instant situation plaintiff's counsel had placed before that Board in great detail his side of this dispute over salary, Mr. Cooper, Executive Director, replying as follows: "Reference is made to your letter of August 29, 1952 relating to the pending action by your client, Mr. Bert J. Mitchell, against the above Company. For reasons which you will readily appreciate, this office makes determinations as to compensation permissible under stabilization regulations only upon information furnished by the employer. Also, the contents of any application by the employer as well as information as to whether any such application has been made are matters of confidence between this Agency and the employer. We wish to take this opportunity to thank you for your interest." In Morford's appeal, contention was likewise made that the regulation under attack was ex parte as to him and void for lack of procedural due process, citing Fifth Amendment, U. S. Constitution. Holding the regulation valid as a war measure, the court said: "The next contention is that proceedings 'before the various Federal Agencies were ex parte as to him, and therefore, void for the lack of procedural due process under the Fifth Amendment to the Federal Constitution'. * * * Assuming, however, that he was not given notice and opportunity to be heard, were the proceedings thereby rendered invalid? The right to contract concerning wages to be received or paid is a part of the liberty of an individual as well as a property right and is undoubtedly protected by the due process clause. It is not an absolute right, however, but is subject to reasonable regulation in the interest of the public welfare. 16 C.J.S., Constitutional Law, § 689, p. 1441. It seems obvious that the right is one which

may be properly regulated when the regulation is fairly calculated to promote the carrying on of a war and the prevention of great monetary inflation invariably connected therewith. * * * It is not difficult to understand why the Stabilization Act of 1942, the Presidential Orders thereunder and the various regulations concerning salaries contained no provision for notice, hearing or appeals by individual employees. Unquestionably it was foreseen that those Boards would be obliged to examine literally thousands of applications for wage increases. If they had been obliged to hold hearings or grant appeals upon application of individual employees, their task would have been stupendous beyond imagination. Assume that a request for wage increases were to be asked by an employer for all of his employees. Assume further that they were given notice of the application and all attended the hearings and later took appeals. The resulting loss of man-hours would have been a distinct detriment rather than a help to the war effort. Even if we concede that individual rights were to some extent impaired by this failure to provide for notice and hearing, that impairment was warranted by the actual public needs of the times. Cf. Kittrell v. Hatter, 243 Ala. 472, 10 So.2d 827."

■ In the same connection, appellant attacks the two Housing Company applications made to the Stabilization Board seeking a determination of plaintiff's salary status as not in good faith in that same were incomplete and at least inaccurate relative to salaries paid to present and former employees engaged in similar work. Even if the testimony be viewed as conflicting in the respect complained of, we cannot say that the facts therein presented were unfair from standpoint of the employer. Aside from this and in support of the judgment rendered, we may presume that the trial court has impliedly found the existence of good faith, the matter not being a jury issue. Wichita Falls & O. Ry. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79.

■■ The third and fifth points will be considered together. On Feb. 6, 1953 all controls under the Defense Production Act of 1950 were suspended by order of the President; the Economic Stabilization Agency, through Arthur S. Fleming, on Feb. 17th thereafter, making public the following rulings: "(2) Q. May new wage, salary, or other compensation adjustments be made retroactive to a date when controls were in effect? A. Any adjustments *determined* or agreed upon on or after February 6, 1953, may be made without violating the Defense Production Act of 1950, as amended. * * * (7) Q. A petition for approval of a wage, salary or other compensation adjustment was denied or modified by a stabilization agency. May such adjustment now be made in full, retroactive to the proposed effective date? A. A *decision* or agreement may now be made to effectuate such adjustment without violating the Defense Production Act of 1950, as amended. * * *." (Emphasis ours.) The court's judgment on jury verdict herein was rendered March 10, 1953. Based on above rulings and judgment herein, appellant argues that said finding on quantum meruit was such a determination or decision made *for the parties* when they had failed and refused to reach an agreement *after* suspension of controls within purview of the italicized administrative wording; thereby entitling him to a judgment for the $34,000, as to which the trial court had stated there was evidence in support. We think it obvious that the mentioned ruling contemplated a *new* and *voluntary* agreement made by the parties after suspension of controls; and not a jury finding of compensation following a lawsuit in which there was a total disagreement concerning compensation. Appellant's position is in nowise strengthened by above interpretation of Director Fleming; the cases heretofore cited continuing applicable, that an agreement for compensation entered into at a time when controls were in effect could not otherwise be validated or legalized by a subsequent suspension of controls. In re Pringle Eng. & Mfg. Co., supra. Appellant's point 5 has already been the subject of discussion adverse to the contention made. Thereto may be added the holding in part of De La Rama S. S. Co., Inc. v. Pierson, supra [174 F.2d 87]: "Appellee points to the language of the Act, section 5(a), 50 U.S.C.A.Appendix,

§ 965(a), which recites: 'No employer shall pay, and no employee shall receive, wages or salaries in contravention of the regulations promulgated by the President under this Act.' He urges that this language merely prevents the paying or receiving of increased compensation without the prior approval of proper authorities. The argument is that since the law forbids payment without prior approval, it cannot be construed to forbid or prohibit promises of payment in the absence of an express provision to that effect. As for the contention that the letter of the quoted language of the Act merely prohibits payment, and does not prohibit promises of payment, we would not hesitate to hold that in view of the declared purposes of the Stabilization Act, such an attempt, without approval of the Stabilization Unit, to provide additional inducements to employees by way of promises of future payments, was prohibited by the Act." Appellant's principal authority of Woodlawn Park Cemetery Co. v. Commissioner, supra, has already been distinguished.

Upon full consideration thereof, all points of appeal must be overruled and judgment of the trial court affirmed.