[L. A. No. 23472. In Bank. Dec. 16, 1955.]

ALPHA BETA FOOD MARKETS, INC. (a Corporation) et al., Plaintiffs and Appellants, v. RETAIL CLERKS UNION LOCAL 770 (an Unincorporated Voluntary Association) et al., Respondents; FOOD EMPLOYERS COUNCIL, INC. (a Nonprofit Corporation), Cross-Defendant and Appellant.

Musick, Peeler & Garrett, Harold F. Collins, McLaughlin & Casey, James A. McLaughlin, Gibson, Dunn & Crutcher, William French Smith and J. Stuart Neary for Appellants.

Gibson, Dunn & Crutcher and William French Smith as Amici Curiae on behalf of Appellants.

Bodle & Landye, George E. Bodle, Daniel Fogel, Leo Geffner, Arnold, Fortas & Porter, Thurman Arnold, Loeb & Loeb and Herman F. Selvin for Respondents.

Charles P. Scully and Nutter & Smith as Amici Curiae on behalf of Respondents.

SPENCE, J.—This is an appeal from a declaratory judgment holding valid an arbitration award made during the period of wage controls imposed during the Korean conflict. Upon a review of the record, we have concluded that the undisputed facts sustain the judgment of the trial court.

After a long history of collective bargaining, the parties on January 1, 1950, executed a "Retail Food Agreement"—hereinafter called the "original agreement"—fixing in detail the terms, conditions, and rates of pay for the employment of union members by plaintiffs. This agreement was to be effective for 15 months—until April 1, 1951—subject to the right of either party, by notice given prior to July 1, 1950, to reopen it to negotiate changes in hourly pay rates. Such notice was given by the union and on September 22, 1950, the parties executed an "Extension and Modification Agreement," extending the term of the "original agreement," as

modified, to December 31, 1955. It provided that it could be reopened annually but only for negotiating changes in straight time hourly rates of pay. However, before execution of the "modification agreement," the Korean conflict began and the Defense Production Act of 1950 (September 8) was enacted (50 U.S.C.A. App., § 2061, et seq.), giving the President authority to issue regulations for wage controls. The parties therefore provided in the "modification agreement," section 8(b), that "in the event any duly authorized and empowered government board or agency establishes controls over wages and/or working conditions as a result of a national emergency, and only in the event such controls nullify, invalidate, alter or in any way render inoperative or illegal the wage increase effective January 1, 1951, as provided herein, or subsequent wage reopenings in accordance with" the parties' agreement, then "the restrictions . . . limiting the reopening rights of each of the parties to negotiate changes only in the straight time hourly rates of pay shall be declared inoperative and shall cease to be in effect during any period in which such board or agency exercises controls" and other types of pay rates might be negotiated.

Pursuant to the 1950 Act, the Wage Stabilization Board was established and wage controls were imposed on January 26, 1951. The Wage Stabilization Board's interpretation of its statutory function was: "Wage increases may be agreed upon but cannot be put into effect without Wage Stabilization Board approval except to the extent permitted by general regulations issued by the Board." (C.C.H. Emergency Labor Law Reports, par. 10, 151.02.) On October 1, 1951, the union gave notice of its desire to negotiate changes relative to various matters, including premium pay for night, holiday and Sunday work. In January, 1952, an amending agreement—hereinafter called the "January 1 agreement"—was made whereby plaintiffs, the employers, were obligated to grant a cost-of-living adjustment; to pay an increase in base wage rates on January 1 of the years 1953, 1954, and 1955; and to make certain contributions to the union benefit fund. These benefits were subject to wage board approval. It was further provided that except as so amended and as to any changes that might result from an arbitration award (infra), the parties' original agreement and modification should remain in full force and effect until December 31, 1955, and there should be no reopening prior to January 1, 1956.

Concurrently with the "January 1 (1952) agreement," the

parties executed a "Submission Agreement," providing for submitting to arbitration the question of what, if any, changes should be made in premium pay for night, holiday, and Sunday work. This agreement further specified: "If such award provides for any change in premium pay, such award shall be submitted for approval to the Wage Stabilization Board by joint petition of the parties hereto if then so required. The effective date of the Award shall be the date upon which it is approved by the Board, if such approval is necessary. If such approval is not required, the effective date shall be the date of said award. In no event, however, shall such Award be effective prior to April 1, 1952."

The arbitration award was made May 12, 1952, in favor of the pay increases. Pursuant to the "submission agreement," the parties submitted, by joint petition, the award to the Twelfth Regional Wage Stabilization Board. By decision of July 24, 1952, it approved the premium pay only for Sunday work, but not for night or holiday work. Thereafter the matter was automatically transferred to the National Wage Stabilization Board at Washington, D. C., for review. It was there pending when the President by executive order of February 6, 1953, terminated wage controls. That order provided, in part, as follows: "(1) All regulations and orders issued pursuant to the Defense Production Act of 1950, as amended, stabilizing wages, salaries, and other compensation, are hereby suspended; (2) The wage, salary, and other compensation adjustments proposed in petitions pending before wage and salary control agencies may now be placed in effect without the approval of such agencies. To the extent that agreements involved in such petitions are conditioned upon approval under Title IV of the Defense Production Act, this order shall be deemed such approval, but such approval shall be subject to paragraph 3 hereof; (3) This order shall not operate to defeat any suit, action, prosecution, or administrative enforcement proceeding, whether heretofore or hereafter commenced, with respect to any right, liability or offense possessed, incurred, or committed prior to this date."

Meanwhile (January 28, 1953) plaintiffs had brought this action alleging a controversy as to the meaning of the "submission agreement"; that defendants contend that premium pay for night and holiday work would become automatically effective immediately following the termination of wage controls, "regardless of whether or not the Wage Stabilization Board shall have approved or disallowed the award of such

premium pay," while plaintiffs contend that "there shall never be any duty on the part of plaintiffs to pay any such premium pay for night work and holidays unless and until such premium pay is specifically allowed and approved by the Wage Stabilization Board in accordance with the statutes of the United States governing wages, and that under the terms of the Submission Agreement, approval of such premium pay by the Wage Stabilization Board is a condition precedent to any liability and duty on the part of plaintiffs to pay such night and holiday premium pay." There was no dispute as to plaintiffs' obligation to pay the agreed increases for Sunday work, and these were immediately put into effect following approval by the decision of the Twelfth Regional Wage Stabilization Board in July, 1952. The cross-complaint filed on behalf of the union alleged the promulgation of the executive order of February 6, 1953, and sought a declaration that the effect of the order was to make the increases payable as of May 12, 1952, when the award was made, or alternatively, as of February 6, 1953, when the executive order was issued.

The trial court found as follows: "The provisions of the Submission Agreement with respect to approval of the award by the Wage Stabilization Board did not create or constitute a condition precedent to the finality of the award with respect to the said premium pay. Such provisions expressed the legal requirement of federal government approval, only; that such government approval was a continuing legal requirement until February 6, 1953; that with the termination of wage controls on that date, pursuant to . . . Executive Order . . . such legal requirement was eliminated." Accordingly, judgment was entered declaring defendants entitled to their premium pay for night and holiday work, with the effective date fixed as February 6, 1953.

In challenging this judgment, plaintiffs argue that wage board approval was a condition precedent to any obligation to pay the increased rates, and that the President's decontrol order would not suffice in the absence of such board approval. On the other hand, defendants maintain that wage board approval was not a condition precedent to the creation of a lawful contract, but that such approval was only required to make the performance of the contract lawful during the period of wage controls; that when wage board approval was no longer a legal necessity because of the decontrol order, the parties' contract on which the arbitration award rested became binding and the premium pay increases were then automati-

cally in effect. In other words, defendants claim that wage board approval was at most only a condition precedent to the duty of performance, and that the President's decontrol order either dispensed with the need for wage board approval or in itself constituted approval.

The Defense Production Act and the specified wage board submission provided a procedure whereby the federal government, through the power of approval of collective bargaining contracts, controlled an aspect of inflation. Except in cases where the parties' agreement was designed as a subterfuge to evade wage control regulations (*infra*), the wage control procedure did not contemplate that the federal government should interfere in the parties' bagaining process. While wage controls existed, collective bargaining agreements providing for a wage increase needed wage board approval, whether such approval was mentioned in the agreement or not; but except as above noted, the agreement itself, even if not approved, was not unlawful. Rather only the making of payments under an unapproved agreement was unlawful.

Thus, upon the termination of wage controls, the necessity for wage board approval disappeared and there only remained the parties' lawful contract expressing the terms of their agreement. They had agreed to abide by the arbitration award and its authorized pay increases accordingly went into effect upon such termination.

Under their prior agreements and in the absence of the above-quoted provisions of section 8(b) of the "modification agreement" (September 22, 1950), the parties could not for five years have negotiated for anything but straight time hourly rates of pay. However, in view of section 8(b) and upon the establishment of wage controls, the prior restrictions in the parties' agreement upon their rights to reopen negotiations for other pay increases became inoperative. The suspension of these restrictions, pursuant to section 8(b), during the time of wage controls was only a definition of the period in which negotiations to reopen the subject of pay upon demands other than straight time hourly rates might be had; it in no way limited the nature of the agreement which the parties might make in their reopened negotiations.

By their "January 1 (1952) agreement" and their concurrently executed "submission agreement," the parties provided for certain premium pay increases subject to wage stabilization regulations. As appears from the above-quoted language of the "submission agreement," an award of pre-

mium pay increases was to be submitted to the wage board for approval if required. Plaintiffs cite the fact that said agreement makes no mention of such an award becoming effective upon the termination of wage controls though the wage board approval theretofore required had not been had. Accordingly, they maintain that the language of the "submission agreement" reflects the intent of the parties that the specified wage board approval should be not only a condition precedent to liability to pay the increased rates, but also a method for testing the merits of the arbitration award.

However, it is the general rule in contract interpretation that stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or inequitable consequences would result. (12 Cal.Jur.2d § 171, p. 389; *Antonelle* v. *Kennedy & Shaw Lbr. Co.*, 140 Cal. 309, 319 [73 P. 966].) Reasonably interpreted, the "submission agreement" indicates that the parties agreed to be bound by the terms of the arbitration award in final settlement of their disputed issues as to premium pay; and as so bound, defendants gave up the right to demand an annual reopening as to changes in the wage scale until January 1, 1956. The recital respecting wage board approval in the "submission agreement" was no more than recognition of a requirement under the law.

Whether or not the parties incorporated such reference in their agreement was immaterial, for "governmental regulations cannot be varied or evaded by private contract," and the insertion of the controverted reference was "a useless gesture," adding nothing nor taking anything away "from the expressed and implied obligations of the parties" as set out in their agreement. (*Atlantic Pac. Oil Co.* v. *Gas Dev. Co.*, 105 Mont. [69 P.2d 750, 758].) This is merely a restatement of the general rule that "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." (12 Cal.Jur.2d § 135, p. 348.)

Plaintiffs unavailingly cite cases where the language of the agreement was clearly conditional in form, involving events as conditions which were wholly within the power of private parties to perform (e.g. *Van Norden* v. *Metson*, 75 Cal.App.2d

595 [171 P.2d 485] ; *Dale* v. *Raines,* 115 Cal.App.2d 309 [252 P.2d 22] ), or requiring governmental approval in express provisional terms (e.g. *Hein* v. *Fox,* 126 Mont. 514 [254 P.2d 1076] ). It is significant that there is no similar conditional wording here in the parties' ''submission agreement.''

If the parties had intended that in the event the arbitration award was made at a time when wage board approval was required and that such approval should be a condition precedent to effectiveness, they could have expressly specified that *only* if so approved, would the award become effective; but not having used the word *only,* they reasonably could be assumed to have intended, as the trial court concluded, that the award would become effective if given such approval *or* on such approval becoming unnecessary.

The requirement of government approval for performance of a contract does not invalidate a lawful contract. (*Nussenbaum* v. *Chambers & Chambers,* 322 Mass. 419 [77 N.E.2d 780, 782-783].) During the period of wage controls, the function of the wage board was not to determine the merits of awarded pay increases pursuant to agreements reached between the contracting parties, but only to determine whether such increases would be inflationary in their effect upon the nation's economy. Contrary to the argument of amici curiae for plaintiffs, the establishment of wage controls did not indicate that wage board approval was intended to operate as a yardstick in relation to the merit of negotiated pay increases; that until such approval was obtained, there was no effective contract between the parties; and unless approval was had before the termination of wage controls, there was nothing left of the parties' contract. Here the payment of the awarded increases would not be in violation of the law as wage controls had been terminated. Plaintiffs do not claim that the parties intended that any awarded increases which might take effect, either by reason of wage board approval or the termination of the requirement for such approval, should constitute, in reality, retroactive, increased payments for work previously performed. Therefore the cases cited by plaintiffs—*De La Rama S. C. Co.* v. *Pierson,* 174 F.2d 84, and *In re Pringle Engineering & Mfg. Co.,* 164 F.2d 299—condemning intentional efforts to circumvent the wage control law by subterfuge, have no bearing on the question presented here.

The trial court properly concluded that the wage control procedure did not contemplate that the government

should interfere in the parties' bargaining process; that while controls were in effect and a curb on inflation was needed, pay increases had to be approved so as to make the payments lawful but when wage controls were terminated the wage board approval was no longer required, then the parties' agreement to abide by the arbitration award was in effect and the required performance, without wage board approval, was effective; that the award should not be given retroactive effect, for from the time it was made on May 12, 1952, and until the decontrol order of February 6, 1953, wage board approval was a continuing requirement, but on the latter date, when controls were terminated, the increase in pay benefits could lawfully go into effect without wage board approval and therefore the operative date of the award was February 6, 1953.

The further point made by defendants that the decontrol order operated by its terms as an actual "approval" of the arbitration award need not be considered here in view of our conclusions that the decontrol order rendered unnecessary the requirement of approval, and that the arbitration award became effective as soon as wage controls were terminated.

Plaintiffs raise two procedural points that should be mentioned. They first question the propriety of including Food Employers Council as a cross-defendant in this action, claiming that while it is composed of some one hundred retail food markets, it employed no persons represented by defendants; it did not come within the coverage of the parties' collective bargaining negotiations; and it therefore was not concerned with the interpretation of the parties' agreements. But the record shows that Food Employers Council was a party to the "submission agreement." Having made the contract in its own name, though as agent of plaintiffs, it could have maintained an action on it. (*Earl Fruit Co.* v. *Herman*, 90 Cal.App. 640, 644-645 [266 P. 592].) In such circumstances, it certainly was properly joined as a cross-defendant in an action seeking a declaration of the rights of the parties to the contract.

 Nor is there merit to plaintiffs' second point, that Joseph T. DeSilva was not a proper party to file the cross-complaint herein. DeSilva was an officer and member of the union, an unincorporated association. The union entered into the contract for the benefit of its members and should have the right to litigate issues connected therewith. However, since an unincorporated association cannot sue, a repre-

sentative or class suit may be brought on its behalf by one of its officers. (*Rosicrucian Fellowship* v. *Rosicrucian etc. Church,* 39 Cal.2d 121, 139-140 [245 P.2d 481].) Moreover, plaintiffs made DeSilva a party defendant, indicating their belief that he had an interest in the litigation; and in the course of the trial, the parties stipulated that if the trial court should conclude that the union rather than DeSilva was the proper cross-complainant, amendment to that effect would be proper and all proceedings on DeSilva's cross-complaint would be deemed to have been had on behalf of the union.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellants' petition for a rehearing was denied January 5, 1956. McComb, J., did not participate therein.