1 F.3d 1249
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 AAR OKLAHOMA, INC., an Oklahoma corporation, Plaintiff-Appellee,
v.
McDONNELL DOUGLAS CORPORATION, a Maryland corporation,
Defendant-Appellant.
 No. 92-6179.
 United States Court of Appeals, Tenth Circuit.
 July 23, 1993.
 
 Before BRORBY, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and EBEL, Circuit Judge.
 ORDER AND JUDGMENT*
 EBEL, Circuit Judge.
 
 
 1
 The defendant-appellant, McDonnell Douglas Corporation ("McDonnell"), appeals from the order of the district court finding it liable for the payment of $1,167,160.69 in disputed contract costs. We affirm.
 
 Facts
 
 2
 McDonnell, through a series of purchase and sale agreements, contracted with several entities who are not parties to this litigation to acquire, modify, repair and sell eight used DC-9 aircraft. FAA regulations required that McDonnell certify the airworthiness of the used craft before they could be sold. McDonnell entered into a subcontract with AAR Oklahoma ("AAR") to inspect, modify and repair the planes in order to bring them into compliance with FAA regulations. McDonnell and AAR were able to pre-determine the inspection and modification tasks ("routine work") and to fix prices thereon. However, the repair tasks ("nonroutine work") were contingent on the results of the inspections and could not be determined in advance. Accordingly, the parties agreed to a fixed price labor schedule and agreed that "any nonroutine work or rework must be approved by buyer prior to the initiation of such work."
 
 
 3
 For each individual aircraft, nonroutine work proceeded as follows: AAR inspectors examined the aircraft for problems and conditions that would require nonroutine work; inspectors would prepare written descriptions of the nonroutine tasks on job cards that would include an estimate of the number of man-hours necessary to complete the task; the job cards would be presented to the McDonnell representatives on site for approval; if approval was granted, the job cards would be used to keep a tally of the man-hours expended on the task.
 
 
 4
 The dispute in the instant case concerns Nonroutine Series 9000 ours ("Series 9000 hours"). These hours were the tally of leadmen and inspectors who would organize and assist the mechanics in the performance of the nonroutine work. The leadmen and inspectors were generally assigned to a particular plane and would spread their time among several different tasks. The parties dispute whether their hours were meant to be included in the descriptions submitted prior to approval of the nonroutine work. However, it is undisputed that their time was not tallied on the job cards, but rather was recorded in a separate "Nonroutine Series 9000" account. When presented with the invoice for these hours McDonnell refused to pay, claiming that the work was not authorized under the contract or through the time card procedure.
 
 
 5
 On April 30, 1990, AAR filed suit in the U.S. District Court for the Western District of Oklahoma for payment of disputed invoices and punitive damages.[1] On April 7, 1992, a stipulation was submitted to the district court which set forth a single pretrial issue to be determined by the district court.
 
 
 6
 4. Upon receiving appropriate briefs from the parties, the Court shall make a pretrial ruling:
 
 
 7
 a. Whether any of the provisions of the Contract (collectively "the provisions") listed in subparagraphs i-iv of this paragraph, as a matter of law impose, as a condition of AAR's right to be compensated under the Contract for Nonroutine Series 9000 hours, a requirement that AAR, before beginning performance of particular items of Nonroutine Work, estimate the amount of such Nonroutine Series 9000 hours that AAR anticipated to incur and charge with respect to each such item and obtain MDC's approval of such estimate:
 
 
 8
 i. Section XIII of the Schedule (page 6 of 9),
 
 
 9
 ii. Sections III(G) and III(I) and (IV) of the Statement of Work, Part I-DC-9-33RC (pages 2-5 of 5),
 
 
 10
 iii. Section [sic] III and IV of the Statement of Work, Part II-DC-9-31 (pages 1-2 of 2),
 
 
 11
 iv. Attachment D (page 1 of 1);
 
 
 12
 or,
 
 
 13
 b. Whether the Court cannot resolve the issue described in paragraph 4.a above as a matter of law because the Court determines that the Provisions are ambiguous on that issue.
 
 
 14
 Stipulation, Order and Order of Judgment of April 7, 1992, Aplt.Apx. at 13137-38. Essentially, the court was asked to address whether as a matter of law the contract required, as a condition of compensation, that AAR submit an estimate of all nonroutine work hours (including the Series 9000 hours), and receive prior authorization from McDonnell Douglas. On April 21, 1992, the district court entered judgment for AAR finding that the contract was not ambiguous and that none of the relevant provisions required prior approval of Series 9000 hours as a condition precedent to AAR's right to compensation. This appeal followed.
 
 Choice of Law and Standard of Review
 
 15
 Under the "choice of law" provision of the contract, California or federal law may apply depending on whether the work performed was commercial or governmental in nature.[2] The parties offer no proof that the disputed Series 9000 hours were to be construed under federal law, and both parties brief the issues as questions of California law. Therefore we will apply California law to the facts of this case.
 
 
 16
 Under California law, contract interpretation is a question of law. Garcia v. Truck Insurance Exchange, 682 P.2d 1100 (Cal.1984). Accordingly, we review the district court's determinations de novo.
 
 Discussion
 
 17
 By virtue of the stipulation entered by the parties, the only question before the district court was whether the contract required AAR to submit, as a condition of compensation, an estimate of all Series 9000 hours, and receive McDonnell's prior authorization. The district court found that under a plain reading of the contract, and by operation of the California rule of contract interpretation that disfavors conditions precedent, the contract did not contain such a condition.
 
 
 18
 We find our review of the issues of this case to be severely limited by operation of the stipulation entered into by the parties. Through the stipulation McDonnell has limited its defense to the claim that prior approval of Series 9000 hours is a condition precedent to compensating AAR.
 
 
 19
 However, under California law, conditions precedent are highly disfavored. Hezel v. Superior Court, 176 Cal.Rptr. 740, 745 (Cal.Ct.App.1981); Pacific Allied v. Century City Steel Products, Inc., 327 P.2d 547, 553 (Cal.Dist.Ct.App.1958). In order to interpret contract language as a condition precedent to payment, the language must be clear and unambiguous.[3] Rubin v. Fuchs, 459 P.2d 925, 928 (Cal.1969); Alpha Beta Food Markets, Inc. v. Retail Clerks Union, 291 P.2d 433, 437 (Cal.1955), cert. denied, 350 U.S. 996 (1956); Hezel, 176 Cal.Rptr. at 745-46; Berry v. Kettle, 63 Cal.Rptr. 804, 806 (Cal.Ct.App.1967); Brubaker v. Beneficial Standard Life Ins. Co., 278 P.2d 966, 969 (Cal.Dist.Ct.App.1955); Larson v. Thoresen, 254 P.2d 656, 658 (Cal.Dist.Ct.App.1953). In fact, we are instructed under California law strictly to construe the provisions against the party asserting the existence of a condition precedent.[4] Hezel, 176 Cal.Rptr. at 745.
 
 
 20
 Whether a provision of a contract constitutes a condition precedent is determined from the whole document, its purpose and the intention of the parties. Pacific Allied, 327 P.2d at 553. We find that the provisions of the contract that the parties have stipulated to be relevant do not clearly establish that AAR had to submit an estimate of the Series 9000 hours and receive McDonnell's prior approval as a condition precedent to compensation.
 
 
 21
 Section XIII of the contract, entitled "Payment and Pricing," does contain the words, "subject to," which have been held sufficient in some contexts to establish a condition precedent under California law. E.g., Rubin, 459 P.2d at 928 (" 'Subject to' is generally construed to impose a condition precedent."); Berry, 63 Cal.Rptr. at 806 (citing as an example of conditional language the phrase "subject to"). However, here that phrase does not seem to be establishing a condition to payment; rather it seems to be merely an acknowledgement that the contract itself is susceptible to being adjusted by authorized changes.[5] In any event, section XIII by its own terms does not include a requirement that Series 9000 hours be pre-approved as a condition to payment. Accordingly, if such prior approval is required, that requirement must be found in one of the provisions that section XIII incorporates by reference.
 
 
 22
 McDonnell argues that section III(G) of Part I-DC-9-33RC Statement of Work required AAR to obtain prior approval of all nonroutine work hours as a condition to compensation.[6] However, a careful reading of Section III(G) reveals that AAR was only required to obtain prior approval of the work, that is the project itself, not the estimated number of hours that would be required to complete the work.
 
 
 23
 McDonnell also argues that the cost limitations in the Statement of Work operate to require estimates and approval of Series 9000 hours prior to compensation. Parts I and II of the Statement of Work established a pricing structure with certain cost limitations for each plane.[7] First, the Statement of Work established a total cost for the routine work. The total cost was broken down into elements corresponding to discrete tasks to be performed on each plane. Second, the Statement of Work set out a dollar amount for the "anticipated" nonroutine work that the parties estimated would be required on each plane. That dollar amount was to serve as a "funding limitation" on the anticipated nonroutine work. In a footnote the parties provided that "[f]or the nonroutine items where there is a funding limitation, charges shall be in accordance with the rates specified in Attachment 'D', Labor Rate Schedule." If the cost exceeds $1,000, AAR must provide McDonnell with a "Fixed Price Cost Quotation." McDonnell would then have two days in which to approve or reject the additional work.
 
 
 24
 We agree that the stated funding limitations appear to place a ceiling on the cost of anticipated nonroutine work. We also agree that the Statements of Work require that AAR seek approval for additional costs to remedy "unforeseen nonroutine discrepency(s)." AAR bore the risk that it would not be compensated for additional costs incurred for such additional nonroutine work if it failed to seek proper approval from McDonnell.
 
 
 25
 However, despite the fact that the Statement of Work established certain cost control mechanisms, we are unable to find that the language of the contract established as a condition precedent that Series 9000 hours be preapproved. First, the funding limitation for anticipated nonroutine work was merely a cap on total cost, and did not mandate an estimate of hours or preapproval of Series 9000 hours. While in practice projects were submitted for approval with descriptions of the work and estimates of the total hours required to complete a particular task, we find no requirement in the contract that the hours be submitted and approved. Second, although AAR was required to submit a fixed price cost quotation for unanticipated nonroutine items, that in itself does not require an estimate of hours. Rather, the quotation could have been a fixed dollar amount.[8] Further, we find no language in the contract that any estimates of hours to perform particular tasks that were included on the job cards were supposed to include any labor other than that of the mechanics performing the actual work. The Series 9000 hours included the work of leadmen and inspectors who were involved with a number of projects simultaneously. We are persuaded that the parties did not agree, and that the contract did not require, the Series 9000 hours to be included in the estimates of hours provided on the job cards.
 
 
 26
 We are mindful of the decisions of the California courts instructing us that extrinsic evidence is to be considered in an attempt to identify the intent of the parties, even where the language of the contract is unambiguous. See Pacific Gas & Electric v. G.W. Thomas Drayage and Rigging Co., 442 P.2d 641, 644-45 (Cal.1968); Trident Center v. Connecticut General Life Ins. Co., 847 F.2d 564, 568-69 (9th Cir.1988). However, we are also cognizant that the California code directs us that "when a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible." Cal.Civil Code Sec. 1639. The Code further provides that "the language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal.Civil Code Sec. 1638. Other California cases instruct us that parol evidence need not be considered where the words in the contract provision are not reasonably susceptible to the interpretation of the party offering the extrinsic evidence. Barris Industries v. World Vision Enterprises, 875 F.2d 1446, 1450 (9th Cir.1989). Despite the tension between these various expressions of California law, we have considered the extrinsic evidence offered by the parties and even in light of this additional evidence, we are not persuaded that the provisions establish a condition precedent.
 
 
 27
 McDonnell claims initially that the pre-subcontract negotiations support its claim that prior approval of Series 9000 hours was a condition precedent. McDonnell draws our attention to the deposition testimony of AAR officials concerning the expectations of McDonnell personnel and to provisions of a subcontract proposed by AAR. McDonnell also claims that AAR's conduct AAR under the subcontract support their interpretation. It points to deposition testimony of AAR officials concerning the practice of obtaining approval for increasing estimates of hours on particular tasks and a letter seeking approval of overtime pay. We do not find this evidence to support McDonnell's proposed interpretation of the contract.
 
 
 28
 None of the evidence proffered by McDonnell uses language that indicates that estimates of Series 9000 hours had to be approved as a condition precedent to compensation. Indeed, none of the evidence specifically discusses Series 9000 hours. Instead, McDonnell would have us infer from general language about expectations of estimates of total hours that Series 9000 hours were to be included in the estimates provided on the job cards. In fact, our review of the record reveals that the only evidence concerning Series 9000 hours supports our conclusion that there was no condition precedent. AAR presented deposition testimony that McDonnell was notified that Series 9000 hours were not to be included in job card estimates and that it was industry practice to exclude lead mechanic and inspector time from those estimates.
 
 
 29
 McDonnell's attempt to rely on language contained in AAR's proposed contract actually undermines their interpretation. That proposed contract was rejected. To the extent that it would have required an estimate of hours and prior approval as a condition precedent, the rejection of that language, and its absence from the subcontract that was ultimately agreed upon, convince us that the parties rejected the condition or at least failed to include it in the subcontract. See District-Realty Title Ins. Corp. v. Ensmann, 767 F.2d 1018, 1023 (D.C.Cir.1985) (exclusion of a proposed clause is strong evidence that parties intended not to give it effect).
 
 
 30
 Finally, we reject McDonnell's attempts to argue that performance under the contract operated to create a condition precedent. The parties expressly provided in the contract that "[t]he contract (which term is intended to include Purchase Order [P.O.] shall not be modified by or interpreted by reference to any course of dealing or usage of trade and shall not be modified by any course of performance. No modification of the Contract shall be effective unless in writing signed by the party to be charged with the modification." Aplt.Apx. at 110. In any event, we find the parties' conduct under the contract to be ambiguous and not helpful to the contract interpretation issue before us.
 
 
 31
 Overall, we are unable to find, either in the language of the contract or its purpose as seen through extrinsic evidence, that the parties agreed through any of the provisions of the contract to require AAR as a condition precedent to compensation to submit and obtain prior approval of Series 9000 hours.[9]
 
 
 32
 We find support for our holding in Pacific Allied v. Century City Steel Products, 327 P.2d 547, 553 (Cal.Dist.Ct.App.1958). In that case, the court was asked to decide whether a contractual provision requiring that a continuous report of labor costs be provided to a supplier was a condition precedent to the supplier's obligation to pay for labor cost overruns. The court, relying on the rule of contract construction that disfavors conditions precedent, found that the report was "incidental, although important, to the main purpose of the agreement and was not a condition precedent." Although the contract before us required approval of certain nonroutine tasks, and AAR in practice submitted estimates of hours to perform those tasks, we do not find support in the contract for the proposition that certain "overhead" time--the Series 9000 time of the leadmen and inspectors--had to be approved before such costs would be compensated.
 
 Conclusion
 
 33
 For the foregoing reasons, the order of the district court is AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The dispute originally involved the payment of a number of invoices as well as counterclaims of cost overruns and time delays. All issues were eventually settled except for the payment of the Series 9000 hours
 
 
 [2]
 The subcontract's choice of law provision states that:
 
 
 [20]
 COMPLIANCE WITH AND APPLICABILITY OF LAWS
 b. Applicable Law. If the contract requires performance under a Government or Government Management Risk contract funding, the rights and duties of the parties arising from or relating to the contract shall be governed by and be construed and interpreted in accordance with the law, custom and usage applicable to U.S. Government contracts and subcontracts, as enunciated by federal judicial bodies, boards of contract appeals, and quasijudicial agencies of the federal government. To the extent that the foregoing is not dispositive or this is a commercial contract (or portions therein are commercial), said contract rights, and duties shall be governed by and be construed and interpreted in accordance with the law of the state in which the MDC Purchasing Department placing this Contract is located, regardless of the location of execution or performance of this Contract.
 Aplt.Apx. at 115.
 
 
 [3]
 In its reply brief, McDonnell directs our attention to case law in which the California courts have found implied unwritten conditions precedent based on the surrounding terms of the contract. See Wal-Noon Corp. v. Hill, 119 Cal.Rptr. 646, 650 (Cal.Ct.App.1975). We decline to consider this argument in light of the integration clause included in the contract which provided: "[u]pon Seller's acceptance, the Order shall be the complete and exclusive statement of the terms of the resulting Contract.... No modification of the Contract shall be effective unless in writing signed by the party to be charged with the modification." Aplt.Apx. at 110. Further, we do not find that the facts of this case are such that we should find an implied condition precedent in the language of the contract. See Verdier v. Verdier, 284 P.2d 94, 100-01 (Cal.Dist.Ct.App.1955)
 
 
 [4]
 Furthermore, ambiguities in standard contracts are construed against the drafter. Cal.Civil Code Sec. 1654 ("the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist). In the instant case, McDonnell was the drafter of the contract
 
 
 [5]
 Section XIII states in full:
 XIII. PAYMENT AND PRICING
 A. For the period of performance April 15, 1990 through June 30, 1990, MDC shall pay SELLER for the performance of this Subcontract, subject to adjustment for any authorized changes, the firm-fixed pricing and rates per plane listed in the Statements of Work Parts 1 and 2, and in Attachment D Labor rate schedule.
 Aplt.Apx. at 65.
 
 
 [6]
 Section III(G) of Part I-DC-9-33RC Statement of Work provides in full:
 G. Seller shall utilize and maintain a Master Log of all work to be accomplished. The Log will be updated on a daily basis and be provided to the Buyer for review and comment. The Master Log will include all entries for routine, nonroutine and rework items. All items in the Master Log shall be reviewed and approved by Buyer. All deficiencies noted by Buyer shall be promptly corrected by Seller. Any nonroutine work or rework must be approved by Buyer prior to the initiation of such work.
 The Master Log will be used to demonstrate the Seller's capability to quantitatively and qualitatively measure the progress of those efforts that will assure the aircraft will meet the scheduled delivery date of the Buyer.
 Aplt.Apx. at 70.
 
 
 [7]
 Part I-DC-9-33RC of the Statement of Work states in pertinent part:
 IV. PERFORMANCE AND PAYMENT
 Listed below are the tasks and related costs. As it is undetermined at this time whether the requirement is for a "C" check or MTI; Paragraph A or B, both prices are listed:
 A. AAR agrees that the total cost, including labor and materials for the tasks and functions listed below with "C" Check is $279,279.00 per aircraft (routine only).
 OR
 B. AAR agrees that the total cost, including labor and materials for the tasks and functions listed below with MTI is $296,779.00 per aircraft (routine only).
 
 
 [1]
 Receipt of aircraft, tasks and functions $1,670.00 per aircraft
 
 
 [2]
 Installation and function of single UHF System $13,850.00 per aircraft
 
 
 [3]
 Installation and function of single IFF System $13,850.00 per aircraft
 
 
 [4]
 Installation and function of single TACAN System $13,850.00 per aircraft
 
 
 [5]
 Removal of DC-9-33 IBERIA interior and installation of "Rapid Change" interior (see Attachment "A") $95,380.00 per aircraft
 
 
 [6]
 Exchange and function engines (JT8D-9 to JT8-9A) $7,454.00 per aircraft
 
 
 *
 7. Perform "C" Check (per manufacturer's specification) $55,000.00 per aircraft. Anticipated nonroutines $143,000.00. Funding limitation.
 
 
 *
 8. Perform Mid-Term Inspection (per U.S. Navy specification) $72,500.00 per aircraft. Anticipated nonroutines $188,500.00. Funding limitation.
 
 
 [9]
 Strip and paint aircraft (per U.S. Navy specification) $75,000.00 per aircraft
 
 
 [10]
 Weigh aircraft: $1,925.00 per aircraft
 
 
 [11]
 Support aircraft flight test and delivery $1,300.00 per aircraft
 
 
 *
 Items 7 and 8 require a funding limitation for the nonroutine items; however, should an unforeseen nonroutine discrepancy(s) be discovered and the cost to correct such discrepancy(s) is in excess of an amount of $1,000.00 U.S. dollars, the Seller will provide Buyer with a fixed Price Cost Quotation for any additional effort and the Buyer will review the additional effort and the Buyer will review the additional cost and advise Seller of Buyer's acceptance or rejection within two (2) working days after receipt of Seller's quotation. For the nonroutine items where there is a funding limitation, charges shall be in accordance with the rates specified in Attachment "D", Labor Rate Schedule
 Aplt.Apx. at 72-3.
 Part II-DC-9-31 of the Statement of Work states in pertinent part:
 III. REQUIREMENTS
 
 
 A
 See Statement of Work Part I-DC-9-33RC
 IV. PERFORMANCE AND PAYMENT
 
 
 A
 AAR agrees that the total cost including labor and materials for the tasks and functions listed below with "C" Check is $70,140.00 per aircraft
 
 
 [1]
 Receipt of aircraft, tasks and functions $1,670.00 per aircraft
 
 
 [2]
 Exchange and function engines $JT8D-9A to JT8D-9) $7,545.00 per aircraft
 
 
 *
 3. Perform "C" Check (per manufacturer's specification) $55,000.00 per aircraft. Anticipated nonroutine is $143,000.00.
 
 
 [4]
 Deactivation of a single UHF System $900.00 per aircraft
 
 
 [5]
 Deactivation of a single IFF System $900.00 per aircraft
 
 
 [6]
 Deactivation of a single TACAN System $900.00 per aircraft
 
 
 [7]
 Upgrade Time Controlled Components $38.50/hour per aircraft
 
 
 [8]
 Weigh aircraft $1,925.00 per aircraft
 
 
 [9]
 Support aircraft flight test and delivery $1,300.00 per aircraft
 
 
 *
 Item 3 requires a funding limitation for the nonroutine items; however, should an unforeseen nonroutine discrepancy(s) be discovered and the cost to correct such discrepancy(s) is in excess of an amount of $1,000.00 U.S. dollars, the Seller will provide Buyer with a Fixed Price Cost Quotation for any additional effort and the Buyer will review the additional effort and the Buyer will review the additional cost and advise Seller of Buyer's acceptance or rejection within two (2) working days after receipt of Seller's quotation. For the nonroutine items where there is a funding limitation, charges shall be in accordance with the rates specified in Attachment "D", Labor Rate Schedule
 Aplt.Apx. at 83-4.
 
 
 [8]
 However, the general issue of whether the funding limit bars AAR's recovery, is not the question that has been submitted to us by the parties stipulation. The question before us is the much narrower one of whether the contract requires, as a condition to payment, the preapproval of Series 9000 hours
 
 
 [9]
 In its brief, McDonnell argues that AAR did not originally intend to charge it for the hours worked by the lead mechanics and inspectors. Aplt.Br. at 9 n. 3. Contrary to McDonnell's arguments, the Attachment D Labor rate schedule seems clearly to anticipate the payment of the lead mechanics and inspectors whose time is billed in the Nonroutine Series 9000 account. The schedule sets forth an hourly rate for the "stores inspector," "aircraft inspector," and "working foreman, leadman or crew chief."
 Attachment D provides in full:
 A. LABOR RATE SCHEDULE
 ------------------- ------
 Aircraft Mechanic $38.50
 Avionics Repairman 38.50
 Welder 38.50
 Tank Sealer 38.50
 Stock Clerk 29.50
 Parts Expediter 29.50
 Shipping and Receiving Clerk 29.50
 Aircraft Painter 38.50
 Cleaner 29.50
 Interior Mechanic 36.00
 Sheetmetal Mechanic 38.50
 Stores Inspector 38.50
 Aircraft Inspector 38.50
 Working Foreman, Leadman or Crew Chief 38.50
 Supervisor N/C
 Engineering Services 65.00
 DER Services 75.00
 Overtime is straight time plus $10.00 per hour.
 Double time is straight time plus $20.00 per hour.
 B. MATERIAL AND OUTSIDE SERVICES
 
 
 [1]
 Nonstocked AAR supplied material: The then current list price plus 20%
 
 
 [2]
 Freight and transportation fees at cost
 Aplt.Apx. at 103.